Joseph P. NOLAN, Plaintiff,

v.

GALAXY SCIENTIFIC CORP, et al., Defendants.

Civil Action No. 98–3396.

United States District Court,
E.D. Pennsylvania.

July 2, 2003.

Peter J. Boyer, McCarter & English, LLP, Philadelphia, PA, Robert A. Burke, Norman E. Greenspan, Blank, Rome, Comisky & McCauley, LLP, Philadelphia, PA, Allan M. Harris, Bruce J. Wisotsky, Ravin, Greenberg & Marks, Roseland, NJ,

Jonathan M. Korn, Blank, Rome, Comisky & McCauley, Cherry Hill, NJ, for Defendants.

Dale E. Lapp, Lancaster, PA, for Plaintiff.

## OPINION

POLLAK, District Judge.

Before this court is the second iteration of dispositive motions brought by the defendants in this diversity case.[1] In the first round of summary judgment motions—which consisted of one motion brought by defendants Galaxy Scientific Corporation ("Galaxy") and James Yoh, and one brought by defendant Richard Harris—the defendants sought summary judgment with respect to Count I, which alleges breach of contract, and Count II, which alleges breach of fiduciary obligation. Summary judgment on Counts I and II was denied by this court's order of March 28, 2001. The instant motions—again raised in one submission by defendants Galaxy and Yoh and another by defendant Harris[2]—seek partial judgment on the pleadings, or, alternatively, summary judgment, with respect to Counts III and IV of the Second Amended Complaint, both of which allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

### Factual background

Plaintiff Joseph P. Nolan has brought suit based upon an alleged agreement through which Mr. Nolan was to provide services to a fledgling business, with the goal of that business eventually procuring a license from the Federal Communications Commission ("FCC") to sell personal communication systems ("PCS") products and services. Mr. Nolan and Mr. Harris became interested in the FCC's "Entrepreneurial Block Auction" of "C Licenses" and began preparations for a bid on one of the licenses. Because the auction offered special incentives and advantages to designated entities with substantial minority ownership, the two sought to partner with Mr. Yoh, the president of Galaxy, a minority-owned company. The following factual summary is substantially identical to that recited in this court's March 2001 memorandum.

Mr. Nolan claims that, after discussions, a contract was drafted to memorialize his agreement with Yoh, Galaxy, and Harris. The alleged contract recites that Nolan will agree to

> render services designed to organize, plan and finance an effort in the personal communication systems industry, with specific emphasis in participating in the entrepreneurial block auction, and recognizing that such efforts are planned to be directed through the formation of a new legal entity(ies) (hereinafter referred to as "Newco") which will be organized by all, or most, of the following: Galaxy Scientific Corporation, Dr. James Yoh, Richard Harris and Jo-

---

1. Counts III and IV, which appear in the Second Amended Complaint and allege violations of § 1962(c-d) of the Racketeer Influenced and Corrupt Organizations Act, were added after the action was removed to federal court on diversity grounds.

2. The plaintiff had responded to the Galaxy/Yoh motion, but had yet to file a submission responsive to Harris's motion, when Mr. Nolan's counsel, Dale Lapp, passed away in January of 2003. As a result of the sad circumstance of Mr. Lapp's death, this court deferred ruling on either motion until substitute counsel had been obtained and Mr. Nolan had the opportunity to respond to both motions. To date, no new counsel has entered an appearance on behalf of Mr. Nolan. However, by letter of June 3, 2003, Mr. Nolan informed this court that, upon consulting (non-trial) counsel, he decided that the Harris motion "does not require a further response" and so "the motions can go forward now."

seph P. Nolan (collectively referred to as "Founders").

The alleged contract then provides for Nolan's compensation as follows:

(1) Payment of $1,000 per month beginning December 1994 and ending May 31, 1995. Thereafter, so long as Newco has been capitalized in an amount equal to at least $1,500,000, the monthly fee will be increased to $2,500 per month, and shall last as long as Newco remains in business and is solvent, or 5 years, whichever shorter.

(2) Ownership in Newco equal to 3% of the outstanding capital stock and/or partnership units computed after issuance of all shares, or units, following the anticipated capitalization of Newco. It's agreed by the Founders that the shares, or units, representing such ownership shall be due and issued to Joseph Nolan coincident with the execution of this letter agreement.

(3) Option to invest up to $50,000 in Newco on terms no less favorable those [sic] provided outside investors, except that Joseph Nolan shall be allowed to purchase his shares, or units, by executing a note payable, secured solely by the shares, or units, purchased by him, as referred to in this item 3. The note payable shall be due in full, plus interest computed at 8% on March 31, 1996.

Additional terms provide for Nolan to be reimbursed for expenses, and to allow Nolan to serve as a director and officer of Newco.

Mr. Nolan produced this contract for the record, but only in unexecuted form. He claims that his executed copy of the contract was left in Mr. Harris's car, and he has not been able to retrieve his files from Mr. Harris. All three defendants deny that the alleged contract was ever signed.

Beginning in December 1994, Mr. Nolan requested payment from Mr. Yoh and Galaxy by forwarding typewritten invoices to them requesting payment in the amount of $1,000 per month. The invoices were approved, and Mr. Nolan received $1,000 per month until May 1995. This money was paid to Mr. Nolan from an account owned by a corporation named PCS One.

There is a dispute over Mr. Nolan's efforts and success in finding capital for "Newco" during the relevant time period. Mr. Nolan claims that he made significant progress toward obtaining capital for PCS One—which Mr. Nolan suggests is the "Newco" company to which his contract referred. Defendants retort that Mr. Nolan made almost no effort to obtain contributors for their venture, and that he was therefore unsuccessful in doing so. They claim that "[h]is efforts consisted of a handful of letters which resulted in a single follow-up meeting"—a meeting that did not produce investment fruit. Defendants' Motion at 4.

In approximately June of 1995, an injunction forestalled the auction of the C Licenses.[3] Mr. Nolan claims that because of the delay, and because he was unable to capitalize "Newco" to the extent of $1.5 million, he did not think he was entitled to any more of the proceeds flowing from the contract. He then essentially stopped working on the project, according to his statement of the facts. He also claimed he inquired "from time to time" of Mr. Harris as to the status of their venture, but that Mr. Harris said nothing had ever occurred.

In May of 1996, Mr. Nolan learned that PCS One had been the high bidder for a

---

**3.** The auction was initially postponed because the auctioning of the A and B Licenses by the FCC took longer than first anticipated. Then litigation resulted in the injunction against commencement of the auction of the C Licenses. That litigation did not involve any of the parties to the case at bar.

PCS contract in Lancaster. Mr. Yoh and Galaxy had joined with Unitel and other entities in raising capital and bidding on the PCS license. PCS One was later sold in a merger transaction to a company called D & E Communications ("D & E"). When Mr. Nolan tried to collect the compensation he claims he was owed under the contract, he was told that the venture in which he was involved had failed, and that the current PCS One was a separate company formed through Galaxy's and Mr. Yoh's negotiations with entirely different parties.

**Standard for judgment on the pleadings and summary judgment**

Where, as here, a party brings a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)[4], a district court is "required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to plaintiff, the nonmoving party." *Inst. for Scientific Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1004 (3d Cir.1991).

If the court considers matters outside the pleadings, a Rule 12(c) motion should be treated as a motion for summary judgment. "Summary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law. A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Josey v. John R. Hollingsworth, Corp.*, 996 F.2d 632, 637 (3d Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))

(citations omitted). The nonmoving party is entitled to have his allegations taken as true, to receive the benefit of doubt when his assertions conflict with those of the movant, and to have inferences from the underlying facts drawn in his favor. *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 433 n. 10 (3d Cir.1996).

To prevail on a summary judgment motion, the moving party carries the initial burden of demonstrating to the court that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied that burden, the burden shifts to the nonmoving party to present evidence that there is indeed a genuine issue for trial. *See id.* at 324, 106 S.Ct. 2548. When the nonmoving party will bear the burden of proof at trial, "the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case." *In re Unisys Savings Plan Litigation*, 74 F.3d at 433.

**Discussion**

The defendants contend that, while the allegations of Mr. Nolan might suffice to avoid summary judgment on a breach of contract claim, the RICO claims do not allege all of the elements necessary to survive judgment on the pleadings. Specifically, the two defendants argue that there is no "predicate act" on which to base a RICO suit.

The portions of the RICO statute relied upon by Mr. Nolan provide for recovery of treble damages, as well as attorneys' fees

---

**4.** The language of Rule 12(c) is as follows:
After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

and costs, by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C.1964(c). Mr. Nolan claims that the defendants have run afoul of 18 U.S.C. § 1962(c) (Count III) and 18 U.S.C. § 1962(d) (Count IV). Those two subsections provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

For guidance regarding the meaning of "a pattern of racketeering activity," to which subsection (c) refers, this court looks to 18 U.S.C. § 1961, which provides definitions applicable to RICO. Section 1961(5) informs that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." Section 1961(1) identifies numerous predicate acts that constitute "racketeering activity," including those alleged by Mr. Nolan—mail fraud and obstruction of justice. The claims of predicate acts involving mail fraud and obstruction of justice will be addressed separately.

*Mail fraud*

The Second Amended Complaint alleges that:

Defendants Yoh, Harris and Galaxy acted in concert among themselves and with others to appropriate for themselves hundreds of thousands of dollars that should have been paid to the Plaintiff under the Agreement. Two primary misrepresentations were made, and are continuing, as follows: (1) Plaintiff and Defendants never executed the Agreement; and (2) Plaintiff's efforts in association with the Defendants had nothing whatsoever to do with PCS One, the company that was successful.

Second Amended Complaint, ¶ 39.

The mail fraud statute, 18 U.S.C. § 1341, applies to those who use the mail to execute a fraudulent scheme. The acts alleged by Mr. Nolan to constitute the mail fraud attributed to the defendants can be divided into the following five categories:

(1) Mr. Harris's affirmative misrepresentations regarding the ongoing business activity of PCS One, Second Amended Complaint, ¶ 40(a);

(2) the failure to disclose to Mr. Nolan that events had transpired entitling him to benefits under the contract, Second Amended Complaint, ¶ 40(b-c, e);

(3) mailings to various third parties failing to disclose Mr. Nolan's relationship to PCS One, Second Amended Complaint, ¶ 40(d-e);

(4) mailings by Mr. Yoh and his counsel responding to Mr. Nolan's demands for benefits and acknowledgment of the agreement and refusing to acknowledge the applicability of the contract, Second Amended Complaint, ¶ 40(f-h);

(5) various filings and discovery responses in this litigation denying a contractual relationship, Second Amended Complaint, ¶ 40(i-m).

This court assumes, for purposes of this motion, that those five categories of alleged acts occurred, and also assumes that the contract proffered by Mr. Nolan was actually executed by him and the defen-

dants. Even making those assumptions, this court finds that the allegations are insufficient to survive a motion for judgment on the pleadings. The following discussion addresses each category of allegations separately.

*(1) Mr. Harris's affirmative misrepresentations regarding the ongoing business activity of PCS One*

While the Second Amended Complaint alleges that Mr. Harris made affirmative misrepresentations to Mr. Nolan, it is nowhere alleged that these misrepresentations were sent through the mail. Accordingly, this allegation fails to meet the most rudimentary requirements of a mail fraud claim.

*(2) The failure to disclose to Mr. Nolan that events had transpired entitling him to benefits under the contract*

■ The court observes that, as with the allegation discussed in the preceding paragraph, the Second Amended Complaint does not identify any mailing whatsoever with respect to this allegation, instead simply asserting that the defendants failed to communicate certain facts to Mr. Nolan. The plaintiff has cited no authority for the proposition that the *absence* of a communication can constitute mail fraud. It is a tautology that mail fraud requires use of the mail. Regardless of whatever duty the defendants might have had to disclose certain facts to Mr. Nolan, the failure to disclose simply does not amount to mail fraud in the absence of a mailing.

*(3) Mailings to various third parties failing to disclose Mr. Nolan's relationship to PCS One*

■ Mr. Nolan's allegations of various mailings to entities such as potential investors, D & E, D & E's attorneys, and PCS One shareholders have somewhat more solid footing than the failures to disclose just discussed—they at least allege what

might be construed as mail fraud. Mr. Nolan alleges that literature mailed to potential investors regarding PCS One failed to disclose Mr. Nolan's involvement in the formation of PCS One and his entitlement to compensation, and that a document entitled "Proxy Statement for PCS One, Inc. and Prospectus for the D & E Common Shares" that was mailed to all PCS One shareholders failed to disclose Mr. Nolan's entitlement to 3% of the company's outstanding equity. To be sure, the allegations related to these mailings are premised on omissions rather than affirmative misrepresentations. However, the Third Circuit's case law makes clear that actions involving the mail fraud statute may be based on "fraudulent misrepresentations *or omissions.*" *Kehr Packages, Inc. v. Fidelcor, Inc.* 926 F.2d 1406 (3d Cir.1991) (emphasis added and internal quotations omitted); *see United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir.1978). As a result, allegations of fraudulent omissions in the various communications between the defendants and shareholders and potential investors are sufficient to state a violation of the mail fraud statute. Nonetheless, I find the causal link between the alleged mail fraud and the purported fraudulent activity too attenuated to sustain RICO liability.

· ■ The Supreme Court has held that a plaintiff seeking to recover in a civil RICO suit must show that the defendants' actions proximately caused the harm suffered. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 265–69 & n. 11, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In *Holmes,* Securities Investor Protection Corporation ("SIPC") brought a RICO claim against Robert G. Holmes, Jr., based on allegations that the latter conspired in a stock-manipulation scheme. SIPC was a private nonprofit corporation, of which broker-dealers First State Securities Corporation and Joseph Sebag, Inc. were

members. The federal suit brought by SIPC accused multiple defendants of conspiracy in a fraudulent scheme (in which defendants manipulated various stocks) leading to the eventual liquidation of the two broker-dealer members. The principal issue addressed by the Supreme Court was the question of whether SIPC had standing to bring a RICO claim.

The Court assumed *arguendo* that the SIPC could "stand in the shoes" of the broker-dealers' customers who never purchased manipulated securities,[5] but opined that "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers. That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims.... The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors." *Id.* at 271, 112 S.Ct. 1311.

Relying upon *Holmes'* explicit statement that proximate cause must be shown in a RICO case, the Fifth Circuit has concluded that a RICO plaintiff must show reliance upon the mailing alleged to have violated

§ 1341. *Summit Props. Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 559 (5th Cir.2000). The court observed that the government need not show detrimental reliance on a mailed misrepresentation to prove a violation of the federal mail fraud statute, *id.* at 558–59, but went on to observe that civil RICO cases changed the analysis: "a civil plaintiff 'faces an additional hurdle' and must show an injury caused 'by reason of' the violation," *id.* at 559 (quoting *Pelletier v. Zweifel,* 921 F.2d 1465, 1498–99 (11th Cir.1991)), and so needs to show detrimental reliance on the fraudulent statements. A number of other circuits have similarly concluded that reliance must be shown before mail fraud will serve as a RICO predicate act.[6]

The law in the Third Circuit is less clear on this issue. In *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737 (3d Cir. 1996), the court apparently embraced the proposition that a RICO plaintiff could not recover if it had not relied upon any of the misrepresentations by the defendant:

> Under New Jersey law, a plaintiff claiming fraud must prove that it detrimentally relied on an intentionally misleading statement made by the defendant. [Plaintiff] admitted however that, early in its relationship with [defendant], it became aware that the invoice prices were higher than the prices envisioned

---

**5.** Those customers who *had* purchased manipulated securities brought suit on their own behalf.

**6.** *See, e.g., Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331 (4th Cir.1996) ("[W]here the predicate act giving rise to civil liability under RICO [i]s alleged to have been mail fraud, prospective plaintiffs, must, in order to demonstrate their standing to sue, plausibly allege both that they detrimentally relied in some way on the fraudulent mailing, and that the mailing was a proximate cause of the alleged injury to their business or property."); *Appletree Square, I v. W.R. Grace & Co.,* 29 F.3d 1283 (8th Cir.1994) ("Because [plaintiff] has

not produced any evidence to show it detrimentally relied on any of the alleged misrepresentations in its purchase of the building, it has failed to establish the existence of a genuine issue of material fact as to whether the alleged misrepresentations proximately caused its claimed injuries and thus lacks standing to bring its civil RICO claims."); *Cent. Distribs. of Beer, Inc. v. Conn,* 5 F.3d 181 (6th Cir.1993) ("[Plaintiff] cannot maintain a civil RICO claim ... absent evidence that the defendants made misrepresentations or omissions of material fact to [plaintiff] and evidence that [plaintiff] relied on those misrepresentations or omissions to its detriment.").

in the contract. [Plaintiff] cannot now claim that it detrimentally relied on [defendant's] intentional misrepresentation because [plaintiff] knew it was being overcharged for purchases right from the start. . . .

For very similar reasons, [plaintiff] cannot make out a claim for violation of the federal RICO statute. . . . As the fraudulent predicate acts required by both state and federal RICO statutes, [plaintiff] argued that [defendant] committed mail and wire fraud. However, the district court found that there could be no finding of fraud in light of [plaintiff's] admission that, early in the relationship, it knew that [defendant] was not complying with the contract. Therefore, the district court held that [plaintiff] could "not rely on fraud as a predicate act for purposes of Federal RICO. . . ."

We agree that [plaintiff] cannot make out a claim for mail or wire fraud. Indeed, no fraudulent act occurred in this case. Without a predicate act, [plaintiff] cannot possibly succeed on its federal . . . RICO claims.

*Id.* at 746–47.

In a decision addressing the scope of the *Holmes* proximate cause requirement, the Third Circuit did not extend the *Ideal Dairy* reasoning to reach the conclusion apparently reached by the courts cited in footnote 6, *supra,* that the plaintiff must have been the person misled by the fraudulent acts of the defendant. In *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494 (3d Cir.1998), the court had before it a case in which plaintiff Brokerage Concepts, Inc. ("BCI") sued U.S. Healthcare ("USH") under RICO to recover damages suffered by BCI due to, *inter alia,* USH's extortionate acts and mail fraud directed toward a third party. *Id.* at 502–03. The *Brokerage Concepts* court differentiated *Holmes* as follows:

Defendants argue that, under *Holmes,* [plaintiff] lacks standing in this case. They assert that since [plaintiff] is alleging that [the third party] has been a victim of the RICO predicate acts, BCI exemplified the "plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person." [*Holmes,*] at 268[, 112 S.Ct. 1311]. We disagree. The injury proved by plaintiff, the loss of its . . . contract with [the third party], is not *derivative* of any losses suffered by [the third party.] Unlike the injuries suffered by the non-purchasing customers in *Holmes,* [plaintiff's] injury was not contingent upon any injury to [the third party], nor is it more appropriately attributable to an intervening cause that was not a predicate act under RICO. Here, [plaintiff's] relationship with [the third party] was a direct target of the alleged scheme-indeed, interference with that relationship may well be deemed the linchpin of the scheme's success. Accordingly, we conclude that [plaintiff] had standing to pursue its civil RICO claim.

*Id.* at 521.

I find the *Brokerage Concepts* case differentiable from the facts in this case. It hasn't been suggested to this court how the misrepresentations to third parties might have caused Mr. Nolan to be harmed. Indeed, Mr. Nolan did not allege that he knew about the misrepresentations at any relevant time. And it surely cannot be said that Mr. Nolan's relationship with the investors was a "direct target of the alleged scheme"—Mr. Nolan alleges only that the purpose of the defendants' scheme was to defraud *him.* At best, Mr. Nolan's injuries are "derivative" of the injury to the investors—and even that has not been pled or argued.

In sum, I find the link too tenuous between the alleged fraudulent purpose of

the defendants—to deprive Mr. Nolan of his contractual rights—and the actions allegedly motivated by that purpose—omitting mention of Mr. Nolan in documents sent to third parties. Accordingly, the mailings to third parties are not predicate acts that will support RICO liability.

(4) *Mailings by Mr. Yoh and his counsel responding to Mr. Nolan's demands for benefits and acknowledgment of the agreement and refusing to acknowledge the applicability of the contract*

(5) *Various filings and discovery responses in this litigation denying a contractual relationship*

■ The fourth category of allegations—which claims that explicit disclaimers of the contract's applicability constituted mail fraud—will be treated together with the fifth category of allegations—which claims that documents filed in this very lawsuit constitute mail fraud. Mr. Nolan asks this court to decide that the mailing of letters denying liability and the filing of litigation documents known to contain falsehoods constitute predicate acts under RICO. Such a decision would have sweeping consequences indeed, potentially permitting any litigant to allege that the opposing party's submissions to the court denying allegations were false and therefore constituted mail fraud. As the Eleventh Circuit has noted, "[a] number of courts have considered whether serving litigation documents by mail can constitute mail fraud, and all have rejected that possibility." *United States v. Pendergraft,* 297 F.3d 1198, 1208 (11th Cir.2002) (collecting cases); *Paul S. Mullin & Assocs. v. Bassett,* 632 F.Supp. 532, 540 (D.Del.1986) ("The Court finds absurd plaintiffs' apparent suggestion that a lawyer's act in posting a letter which states a client's legal position in a dispute can constitute mail fraud. If such were the situation, every dispute in which the parties' counsel exchanged letters could give rise to RICO litigation. Such activity simply is not fraudulent."). This court is unwilling to expand RICO liability for mail fraud in such a dramatic fashion as to include litigation papers and pre-litigation statements of legal position.

### Obstruction of justice

Mr. Nolan also seeks to satisfy the requirement for RICO predicate acts by alleging that the defendants have engaged in obstruction of justice. In essence, the plaintiff contends that by (a) failing to produce the signed agreement between plaintiff and defendants, as well as other documentation; and (b) filing a suit based on the same factual scenario in New Jersey state court,[7] the defendants have obstructed justice. Attendant on plaintiff's contention is the substantial risk, as the defendants point out, that any discovery dispute or instance of multi-venue litigation could become a RICO case.[8]

---

7. The Second Amended Complaint states that counsel for Dr. Yoh and Galaxy, in a certification required to be filed under applicable New Jersey law, "blatantly misrepresented that there was no pending litigation involving the same subject matter and controversy." Second Amended Complaint, ¶ 43. "As soon as the misrepresentation was brought to the trial judge's attention, the matter was dismissed." *Id.*

8. *See Richmark Corp. v. Timber Falling Consultants, Inc.,* 730 F.Supp. 1525, 1532 (D.Or.

1990) ("[S]ection 1503 [the obstruction of justice statute] has not been interpreted to apply to a civil discovery dispute where there has been no court order or subpoena regarding the production of documents. In light of the extensive framework of rules and remedies provided for the resolution of civil discovery disputes, the court declines to stretch the definition of obstruction of justice to include the concealment or withholding of discovery documents....").

 I note that the Third Circuit has held that neither (a) the potential for an "enormous multiplicity of suits" nor (b) the existence of other remedies like discovery sanctions, evidentiary inferences, contempt citations, and criminal investigation prevent using RICO to cover a situation in which the plaintiff alleged that "subornation of perjury, destruction of documents, interference with a United States Marshal, perjury, witness intimidation, and an attempt to blackmail the district judge" constituted RICO injuries. *Malley–Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 344 n. 4, 353–55 (3d Cir.1986). I am not persuaded, however, that the reasoning of *Malley–Duff* extends to the facts of this case. Obviously, Mr. Nolan has alleged far less outrageous conduct by the defendants than the misdeeds involved in *Malley–Duff.* I see no reason to suppose that Congress contemplated that, in the absence of the sort of egregious misbehavior that took place in *Malley–Duff,* run-of-the-mill disputes that plague much litigation should be regarded as rising to the level of obstruction of justice.

## Conclusion

Because I find that no predicate acts have been alleged that will support RICO liability, I will, with the accompanying order, grant partial judgment on the pleadings with respect to the RICO allegations in this case.

### ORDER

For the reasons stated in the accompanying opinion, it is hereby ORDERED that:

(1) Defendants Galaxy Scientific Corporation and James Yoh's Motion for Partial Judgment on the Pleadings or, in the Alternative, for Partial Summary Judgment on the RICO Claims (Docket # 76) is GRANTED.

(2) Motion of Defendant Richard Harris for Partial Judgment on the Plead-ings, or in the Alternative, for Partial Summary Judgment on the RICO Claims (Docket # 78) is GRANTED.

(3) JUDGMENT IS GRANTED in favor of all defendants on Counts III and IV of the Second Amended Complaint.