Sheralina BAKER, Carrie Contessa, Pamela Jack, Christine Smith, and Tara Scott, Plaintiffs,

v.

FAMILY CREDIT COUNSELING CORPORATION; Debt Solutions, Inc., James R. Armstrong, Jr., Igor M. Gelman, FCCC Services Inc., JRA Property & Land Management, Llc, Top Financial Sales & Marketing, Inc., Consumer Financial Marketing, Inc., Consumer Debt Management & Education, Inc., and Vegga Corporation, Defendants.

Civil Action No. 04–5508.

United States District Court, E.D. Pennsylvania.

July 28, 2006.

Debora A. O'Neill, Meyerson Law Firm, Mary L. Russell, Roberta D. Liebenberg, Fine Kaplan and Black, R.P.C., Philadelphia, PA, for Plaintiffs.

Andrew Hanan, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Defendants.

## MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

Plaintiffs Sheralina Baker, Carrie Contessa, Pamela Jack, Christine Smith, and Tara Scott have filed a class action on behalf of themselves and other consumers who have entered into debt management plans.[1] Second Am. Compl. ¶¶ 1–2 ("Compl."). Each of the named plaintiffs enrolled in a debt management plan with defendant Family Credit Counseling Corp. ("FCCC") or defendant Consumer Debt

---

1. The characteristics of a debt management plan are described in Section II(A) below.

Management & Education, Inc. ("CDME"). *Id.* ¶¶ 36–40. Named as defendants are those entities and two individuals, James R. Armstrong, an officer, director, shareholder, and founder of FCCC and Igor M. Gelman, also an officer, director, shareholder, and founder of both FCCC and FCCC Services Inc. ("FCCC–2"). *Id.* ¶¶ 44–45. Also named as defendants are FCCC–2, Debt Solutions, Inc. ("Debt Solutions"), JRA Property and Land Management, LLC ("JRA Property"), Top Financial Sales & Marketing, Inc. ("Top Financial Sales"), Consumer Financial Marketing, Inc. ("Consumer Financial"), and Vegga Corporation ("Vegga"), which plaintiffs allege are closely interrelated with the defendants FCCC and CDME, the companies with which they contracted for debt management services. *Id.* ¶¶ 42, 47–49, 52. Plaintiffs' claims against all defendants are based on the Credit Repair Organization Act ("CROA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), breach of fiduciary duty, breach of contract, and unjust enrichment. Defendants have filed a Motion to Dismiss the Second Amended Complaint. For the reasons that follow, defendants' motion is granted in part and denied in part.

## II. BACKGROUND

The following is taken from plaintiffs' Second Amended Complaint (hereinafter "Complaint").

### A. Facts of the Case

As summarized by plaintiffs in the first paragraph of their Complaint:

> This is a consumer class action brought on behalf of victims of a complicated scheme, involving interrelated companies and individuals, to appropriate hundreds of dollars from individual consumers under the guise of "debt management" or credit repair without actually providing worthwhile or timely services to the consumers. As a result of defendants' actions and inaction, members of the class are worse off financially than they were before dealing with the defendants, and many find that the credit ratings they were trying to improve actually have worsened.

Compl. ¶ 1.

Defendants market and sell debt management plans ("DMPs") as a means for consumers to pay off their debts by consolidating a consumer's debts into one monthly payment. *Id.* ¶ 6. Defendants tell consumers that they have relationships with creditors, so that if the consumer enrolls in a DMP with one of the defendants, they will receive lower interest rates on their debts and "repair bad credit negatives" on their credit reports. *Id.* ¶¶ 7, 16. Each named plaintiff enrolled in a DMP with defendant CDME or FCCC,[2] paying a sign-up fee to do so.[3] *Id.* ¶ 2. Plaintiffs were told that this sign-up fee would be used to pay off their creditors; instead, however, defendants kept the fee.[4] *Id.*

**2.** Plaintiffs Jack, Contessa, and Scott enrolled in DMPs with CDME; plaintiffs Smith and Baker enrolled in DMPs with FCCC. Compl. ¶¶ 123, 125, 127, 129, 142(d). While plaintiff Baker enrolled in the DMP through contacts with defendant Debt Solutions, *id.* ¶ 36, 142(c), the DMP was actually administered by defendant FCCC. *Id.* ¶ 142(d).

**3.** The amount of the fee was $199.00, $299.00, or, if the first monthly payment was larger than $299.00, the amount of the first monthly payment. *Id.* ¶ 7. According to plaintiffs, "legitimate" credit counseling agencies charge sign-up fees of no more than $75.00. *Id.* ¶ 12.

**4.** Plaintiffs Scott and Smith attempted to cancel their contracts with defendants after learning that the sign-up fee would not be used to pay their creditors, but defendants refused to refund the money. *Id.* ¶¶ 128, 130.

¶ 117. Plaintiffs also authorized defendants to make monthly withdrawals from their checking accounts in order to fund the DMPs.[5] *Id.* ¶¶ 36–40. Further, each plaintiff executed a "Limited Power of Attorney" form allowing defendants to act as plaintiffs' fiduciary to disclose information to creditors and negotiate with creditors. *Id.* ¶¶ 111, 141(a).

Despite payment of the sign-up fee and authorization of the monthly withdrawals, defendants failed to establish a DMP for any of the named plaintiffs. *Id.* ¶ 3. While defendants were purportedly establishing DMPs, they told plaintiffs not to contact their creditors, and to direct all contacts from creditors to defendants. *Id.* ¶¶ 23, 31. As a result, plaintiffs stopped paying their creditors directly, believing instead that defendants were making their payments through the DMPs. *Id.* ¶ 31. Because defendants failed to initiate and administer DMPs, as they agreed to do, plaintiffs claim they have suffered a variety of harms—loss of the start-up fees which were never refunded; damage to their credit histories; payment of higher interest rates on their outstanding debts; and payment of late fees on those debts. *Id.* ¶¶ 124, 126, 128, 130, 140.

Plaintiff Baker's alleged experience with defendants, which lasted the longest of the five named plaintiffs, paints a picture of consumers lulled into believing that defendants were paying off their creditors when in fact their debts were continuing to accumulate.[6] Plaintiff Baker enrolled in a DMP with defendant FCCC on March 12, 2003, paying a sign-up fee of $199.00. *Id.* ¶ 142(d). On April 23, 2003, FCCC sent two "form proposals" to IC Systems, one of Baker's creditors. *Id.* ¶ 143. The proposals stated the amount of debt Baker owed to IC Systems and stated that a payment of $18.00 would be disbursed on Baker's behalf on May 28, 2003. *Id.* The proposals also attempted to solicit a commission from IC Systems payable to FCCC in exchange for FCCC collecting plaintiff Baker's payments. *Id.* By letter dated May 6, 2003, IC Systems notified FCCC that it did not accept payments from credit counseling agencies such as FCCC, nor did it accept "bulk" payments for multiple consumers' accounts. *Id.* ¶ 144. Despite this information, defendant FCCC sent IC Systems a series of bulk payments on behalf of Baker and other individuals in January and February of 2004.[7] *Id.* ¶ 146(m).

On December 18, 2003, plaintiff Baker authorized FCCC to make monthly automatic withdrawals from her checking account in the amount of $153.00.[8] *Id.* ¶ 145(g). At that same time, she sent three form letters to her creditors, stating that she was closing her accounts with them because FCCC would now be handling those accounts. *Id.* ¶ 145(h). Subsequently, in January of 2004, FCCC withdrew the $153.00 monthly charge and a

---

5. The amounts of these authorized monthly withdrawals ranged from $153.00 to $397.00. Compl. ¶¶ 36, 40.

6. Plaintiffs also have the most information about plaintiff Baker's experience because the Court ordered defendants to provide plaintiff Baker with a copy of her entire file by March 10, 2005.

7. According to plaintiffs, defendant FCCC sent the payments "knowing" they would be rejected. Compl. ¶ 146(m).

8. After plaintiff Baker paid the sign-up fee and filled out the requisite forms in March of 2003, Compl. ¶ 142(d), there was some delay before she began making monthly payments. On September 17, 2003, defendant FCCC sent Baker a letter stating that customer service had been unable to contact her. Compl. ¶ 145(a). After receiving the letter, Baker called defendant in October to set up the DMP and begin making monthly payments. *Id.* ¶ 145(b).

$24.00 service fee from Baker's checking account. *Id.* ¶¶ 146(b)-(c). In early February 2004, FCCC sent Baker a monthly statement listing the four creditor accounts to be paid under Baker's DMP and the amounts of the payments: two $18.00 payments to IC Systems, a $75.00 payment to NCO Financial, and an $18.00 payment to Verizon Wireless. *Id.* ¶ 146(d). However, none of these payments were credited to Baker's accounts with these creditors. *Id.*

After FCCC obtained two additional automatic monthly withdrawals from Baker's checking account totaling $310.00, FCCC prepared a new creditor form for PECO Energy, another of Baker's creditors. *Id.* ¶ 146(I). FCCC was supposed to disperse $75.00 a month to Baker's PECO account. *Id.* Despite the fact that Baker told FCCC that PECO had transferred the account to another company, Inovision, FCCC sent proposed disbursement forms to PECO (and not Inovision) on March 12, 2004. *Id.* PECO also informed FCCC that Baker's account had been transferred to Inovision some time in March 2004. *Id.* ¶ 146(*l*). Notwithstanding such notices, FCCC sent a $75.00 check to PECO on March 22, 2004. *Id.* ¶ 146(n).

In early May 2004, Baker, who had applied for a mortgage, was notified that her application was in jeopardy due to nonpayment of accounts on her credit report. *Id.* ¶ 146(r). By this time, FCCC had made four automatic withdrawals from Baker's checking account, each in the amount of $177.00,[9] and the two additional withdrawals totaling $310.00. *Id.* ¶¶ 146(i), 146(o)-(p). Baker began calling FCCC Customer Service, asking about the pay-

ments that were to have been made on her accounts, and was told that FCCC had to "research the matter." *Id.* ¶ 146(r). Despite several telephone calls over the next few days, Baker received no further information about her account.[10] *Id.* On May 25, 2004, Baker was notified that her mortgage application was rejected because of her failure to make monthly payments on her outstanding debts. *Id.* ¶ 146(u). Baker continued to try to contact FCCC, without success, in order to find out what had happened to her payments and to terminate her DMP. *Id.* ¶¶ 146(x), 146(y).

In early June 2004, defendants sent Baker a monthly statement, showing that Baker's Verizon Wireless account had been paid down to $194.59 from its original balance of $284.00, and that Baker's PECO account had been paid down to $1,859.00 from its original balance of $2,336.00. *Id.* ¶ 146(z). At this same time, Baker received a notice from a .collection agency stating that her PECO account had actually *increased* and that, at that point, she owed PECO $2,410.78. *Id.* After more telephone calls to FCCC, Baker finally received a statement showing that none of Baker's monthly payments had been sent to creditors. *Id.* ¶ 146(aa). As a result, Baker asked for a refund of the money she had paid to FCCC, but FCCC refused to return any of her money, and continued to deduct the $24.00 monthly service fee from her checking account until August 2004. *Id.* ¶ 146(bb).

## B. *The Defendants*

Plaintiffs allege that defendants are a network of interconnected businesses and

9. Each $177.00 monthly withdrawal included the $153.00 which was to be paid to Baker's creditors and the $24.00 service fee. *Id.* ¶ 134.

10. Like Baker, plaintiff Jack spent several months attempting to contact defendant

FCCC regarding her DMP, with little success. *Id.* ¶¶ 124, 148(g), 148(h). In general, the Complaint paints a picture of defendants who are difficult to contact and give customers "the run around." *Id.* ¶¶ 30, 146(r), 150(e).

individuals.[11] Specifically, as alleged by plaintiffs, "all of the named defendants and each of them acted jointly and severally, and are associated with one another, participated in the scheme described herein with each other and benefitted from the scheme to defraud the named plaintiffs and the Class herein." *Id.* ¶ 54.

As described above, defendants FCCC and CDME provided the DMPs to the named plaintiffs. Compl. ¶ 2. Although these companies have different names, both companies send uniform welcome packets to consumers, including identical welcome letters and form letters for consumers to send to their creditors. *Id.* ¶¶ 20–21. Defendants Debt Solutions and Vegga direct prospective customers to the services provided by defendants FCCC and CDME. *Id.* ¶¶ 9, 11, 72. Defendant FCCC–2, incorporated as a non-profit while this case was proceeding, provides "administrative services" to defendant FCCC. *Id.* ¶ 5. Defendants JRA, Consumer Financial, and CDME all receive money obtained by defendant FCCC from the DMPs. *Id.* ¶¶ 32, 34, 53.

Defendants FCCC, FCCC–2, and Debt Solutions all have offices at 4850 North State Road 7 in Lauderdale Lakes, Florida.[12] *Id.* ¶ 41–43, 47. Defendant JRA Property was previously located at these offices, as was defendant Consumer Financial Marketing. *Id.* ¶¶ 48, 50. On January 6, 2005, JRA Property filed papers with the Florida Secretary of State changing its place of business to 3933 North Andrews Avenue, Oakland Park, Florida. *Id.* ¶ 48. On that same date, defendant Top Financial was incorporated, with its principal place of business also at 3933 North Andrews Avenue, Oakland Park, Florida.[13] *Id.* ¶ 49. At some point, defendant Consumer Financial Marketing also moved to the 3933 North Andrews Avenue address. *Id.* ¶ 50. Defendant CDME has its principal place of business at 7516 East Independence Boulevard, Suite 110, Charlotte, North Carolina. *Id.* ¶ 51. Defendants FCCC and Debt Solutions also have offices at that same address. *Id.* ¶¶ 41–42.

Individual defendants Armstrong and Gelman are officers, directors, shareholders, and founders of FCCC and Debt Solutions, the organizations which provided the DMPs to plaintiffs. *Id.* ¶¶ 44–45, 88, 101. Armstrong is also an officer, director, founder, and/or manager of JRA Property, Consumer Financial Marketing, CDME, and Top Financial Sales;[14] Gelman is also the owner, officer, director, shareholder, founder, and/or manager of Vegga. *Id.* ¶¶ 44–45.

## C. *History of the Lawsuit*

The initial complaint in this case was filed by plaintiff Baker, on behalf of herself

---

11. Plaintiffs' allegations of interconnectedness among the defendants are significant in at least three respects. First, regarding plaintiffs' RICO claim, the alleged relationships among defendants are necessary to demonstrate the enterprise element of that claim. Second, these alleged connections demonstrate that the individual plaintiffs' experiences are not simply isolated, random events, but part of defendants' business tactics. Third, defendants' alleged relationships allow plaintiffs to assert claims against all defendants, even though plaintiffs only had direct contact with two defendants, FCCC and CDME.

12. Defendant FCCC is in suite G102. Defendants Debt Solutions and FCCC–2 are in suite G104. *Id.* ¶ 41–43, 47.

13. According to plaintiffs, Top Financial Sales was created by defendants in response to this suit being filed in order to protect defendants' profits. *Id.* ¶¶ 33, 49.

14. Armstrong also authorized and signed the checks sent from defendants to plaintiffs' creditors, such as the checks sent from defendant FCCC to plaintiff Baker's creditors. *Id.* ¶¶ 29, 146(m), 146(n).

and others similarly situated, against defendants FCCC, Debt Solutions, Armstrong, and Gelman on November 26, 2004. By Order dated March 2, 2005, plaintiff was granted leave to file an Amended Complaint, which was filed on March 21, 2005. The Amended Complaint added as defendants CDME, Consumer Financial Marketing, FCCC–2, JRA Property, Top Financial Services, and Vegga. On August 5, 2005, plaintiffs filed a Second Amended Complaint ("the Complaint"), which added Contessa, Jack, Scott, and Smith as named class plaintiffs.

Plaintiffs allege seven counts against each defendant in the Complaint:

1. Violations of the Credit Repair Organization Act ("CROA"), Compl. ¶¶ 153–170;

2. Violations of RICO, *id.* ¶¶ 171–183;

3. Conspiracy to violate RICO, *id.* ¶¶ 184–190;

4. Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), *id.* ¶¶ 191–198;

5. Common law breach of fiduciary duty, *id.* ¶¶ 199–203;

6. Breach of contract, *id.* ¶¶ 204–209; and,

7. Unjust enrichment, *id.* ¶¶ 210–215.

In their prayer for relief, plaintiffs seek certification of a class action, statutory, compensatory, and punitive damages, attorneys' fees and costs, and injunctive relief. Defendant filed a Motion to Dismiss the Second Amended Complaint on September 8, 2005.[15]

The Court ordered limited discovery on March 2, 2005, requiring defendants to provide plaintiff Baker with a copy of her entire file. Plaintiffs then filed a Motion to Compel Discovery on May 9, 2005. By Order dated June 7, 2005, the Court required defendants to provide initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1) and all documents from plaintiff Baker's file which had not yet been produced. On January 24, 2006, plaintiffs filed a Motion for Leave to Resume Discovery. This motion is granted.[16]

## III. ANALYSIS

In analyzing defendants' Motion to Dismiss the Second Amended Complaint, the Court accepts as true the facts alleged in the Second Amended Complaint, drawing all reasonable inferences in favor of plaintiffs. *In re Merck & Co., Inc. Securities Litig.*, 432 F.3d 261, 266 (3d Cir.2005); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir.2004). The Court will grant defendants' Motion to Dismiss the Second Amended Complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations in the Second Amended Complaint. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

Defendants' Motion to Dismiss the Second Amended Complaint attacks almost every one of plaintiffs' claims, with the exception of their breach of contract claim (Count 6). The Court will analyze defendants' arguments under each of plaintiffs' claims.

---

**15.** Defendants argued in their Motion to Dismiss the Second Amended Complaint, *inter alia*, that the case should be dismissed for improper venue. After several telephone conferences with the Court and discussions between the parties extending over several months, defendants agreed on April 3, 2006 to waive their venue objections. *See* April 3, 2006 Letter from defense counsel.

**16.** Because defendants' Motion to Dismiss the Second Amended Complaint will largely be denied, the Court will schedule a telephone conference at the parties' earliest convenience in order to issue a scheduling order. In the meantime, the parties may begin discovery.

## A. Credit Repair Organization Act Claim—Count One

### 1. The Credit Repair Organization Act

The Credit Repair Organization Act (CROA) was enacted in 1996. The purpose of the Act is to ensure that consumers are provided with the information necessary to make an informed decision in purchasing the services of credit repair organizations, and to protect the public from unfair or deceptive advertising practices by credit repair organizations. 15 U.S.C. § 1679(b).

The CROA defines a "credit repair organization" as:

(A) . . . any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(I) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

(B) does not include—

(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of Title 26.

15 U.S.C. § 1679a(3).

Various acts are prohibited under the CROA. Those relevant to plaintiffs' claims are:

- Making or using "untrue or misleading representations" regarding the services provided by the credit repair organization. 15 U.S.C. § 1679b(a)(3).
- Engaging, directly or indirectly, "in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(4).
- Charging or receiving any money for the performance of any service by the credit repair organization before the service has been fully performed. 15 U.S.C. § 1679b(b).

The CROA also requires that credit repair organizations provide specific disclosures to consumers before executing any contract between the consumer and the credit repair organization, and that such contracts must be in writing and must include specific terms and conditions. 15 U.S.C. §§ 1679c, 1679d.

### 2. Defendants' arguments

Defendants argue that they are not credit repair organizations because they do not provide "services designed to improve a consumer's credit record, credit history, or credit rating." Def. Memo. at 25. Instead, defendants argue, they provide services to reduce and/or eliminate consumers' interest rates, fees, and overall monthly payments to creditors. *Id.* Additionally, defendants argue that defendant FCCC cannot be held liable as a credit repair organization because it is a nonprofit. *Id.* at 27–29.

Defendants further argue that plaintiffs have only alleged CROA violations against defendants FCCC and CDME, because those were the only defendants with whom plaintiffs had contracts, and thus only FCCC and CDME can be held liable for CROA violations. *Id.* at 30. Finally, defendants argue that they cannot be held liable under the CROA because plaintiffs have not "established" that any of the defendants made false representations. *Id.* at 26–27.

### 3. Plaintiffs have alleged that defendants are credit repair organizations

An organization must meet four requirements in order to fall within the definition of a credit repair organization under 15 U.S.C. § 1679a(3). The organization must:

(1) Use an instrumentality of interstate commerce or mails;

(2) To sell, provide, or perform (or represent that it could do so);

(3) In return for valuable consideration;

(4) Services or advice about services to improve a consumer's credit record, credit history, or credit rating.

§ 1679a(3); *Costa v. Mauro Chevrolet, Inc.*, 390 F.Supp.2d 720, 727 (N.D.Ill.2005) (listing the four requirements).

Plaintiffs repeatedly allege that defendants used mail, e-mail, and facsimile to transmit documents and information to them. Compl. ¶¶ 20, 80–81, 104. Therefore, plaintiffs have alleged that defendants use instrumentalities of interstate commerce and the mails and meet the first requirement.

Defendants argue that plaintiffs have failed to meet the second element, because they have not established false representations made by defendants. Def. Memo. at 26–27. However, at the motion to dismiss stage of litigation, plaintiffs need not "establish" anything; they need simply to allege a cause of action. *See McGrath v. Johnson*, 67 F.Supp.2d 499, 513 (E.D.Pa. 1999) ("To survive a motion to dismiss, [plaintiff] need only allege a cause of action, he need not prove it."). Furthermore, the Complaint includes numerous allegations of false representations made by defendants. *See, e.g.,* Compl. ¶¶ 6–7, 16, 26, 29.[17] Thus, plaintiffs have made sufficient allegations of fraudulent representations to satisfy the second element of a the credit repair organization definition.

The third element in the definition of a credit repair organization is payment of valuable consideration. Plaintiffs have alleged that defendants received an initial payment from each plaintiff, ranging from $199.00 to $397.00. Compl. ¶¶ 36–40. Thus, the third element is met.

Finally, regarding the fourth element, defendants argue that the purpose of plaintiffs' DMPs was to reduce and/or eliminate interest rates, fees, and overall monthly payments to creditors. Therefore, defendants argue, plaintiffs have not alleged the fourth element defining a credit repair organization, services designed to "improv[e] any consumer's credit record, credit history, or credit rating." 15 U.S.C. § 1679(a)(3)(A)(i). The Court disagrees. To the contrary, plaintiffs have made several allegations that defendants represented they provided services designed to "improv[e] any consumer's credit record, credit history, or credit rating." For example, plaintiffs allege that "[d]efendants . . . make false representations to consumers concerning repair of credit histories." Compl. ¶ 87. Plaintiffs also allege that "[d]efendants represent to consumers that they are providing credit repair services through advertisements . . . that defendants' debt consolidation plans will 'help repair bad credit negatives on your credit report.' " *Id.* ¶ 160. These allegations are sufficient to satisfy the fourth element in the definition of a credit repair organization.

---

**17.** For example, plaintiffs allege that "[d]efendants' uniform solicitations lead consumers to believe that FCCC, Debt Solutions, and CDME have relationships and agreements with creditors that will reduce and eliminate consumers' debts and interest, if consumers enroll in defendants' DMPs. Defendants represent to consumers that consolidation of consumer debts through defendants' DMPs will 'repair bad creditor negatives' on consumers' credit reports." Compl. ¶ 7.

■ The Court concludes that plaintiffs have sufficiently alleged that defendants meet the four requirements of a credit repair organization under the CROA. Simply because an organization purports to offer a "debt management plan" to reduce a consumer's credit rates and payments does not mean that the organization cannot be held liable under the CROA. In fact, at least one other district court has determined that an organization supposedly offering DMPs may be held liable under the CROA, reasoning that "if it may be proven that certain of the Defendants represented that they would re-establish their clients' spotty credit reports, and if abuses forbidden by the CROA then took place, Plaintiffs may be able to recover under this statute." *Limpert v. Cambridge Credit Counseling Corp.*, 328 F.Supp.2d 360, 365 (E.D.N.Y.2004).

### 4. Plaintiffs may allege CROA violations against non-profits FCCC and FCCC–2

■ The CROA explicitly defines credit repair organization to exclude "any non-profit organization which is exempt from taxation under section 501(c)(3)." 15 U.S.C. § 1679a(3)(B)(i). Defendants argue that defendant FCCC cannot be held liable because it has 501(c)(3) status. (While defendants refer to only defendant FCCC as a non-profit, defendant FCCC–2 is also as a non-profit; therefore, the Court will include FCCC–2 in this analysis. Compl. ¶ 47.) The Court concludes that, at this point in the litigation, plaintiffs' claims against FCCC and FCCC–2 under the CROA may proceed, because plaintiffs have alleged that these two defendants are not actually operating as non-profits.

An organization is exempt from taxation under section 501(c)(3) if it is "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes." 26 U.S.C. § 501(c)(3). Internal Revenue Service (IRS) regulations provide that qualifying for the tax exemption is a two-part test.

> In order to be exempt as an organization described in section 501(c)(3), an organization must be *both* organized *and* operated exclusively for one or more of the purposes specified in such section. If an organization fails to meet either the organizational test or the operational test, it is not exempt.

26 C.F.R. § 1.501(c)(3)–1(a)(1) (emphasis added); *see also Geisinger Health Plan v. C.I. R.*, 985 F.2d 1210, 1214 (3d Cir.1993) ("An organization must be both organized and operated exclusively for a charitable purpose to qualify for exemption under section 501(c)(3).").

Plaintiffs argue that defendants FCCC and FCCC–2 fail to meet this test; while they may be organized as non-profits, they do not operate exclusively for one or more of the purposes specified in section 501(c)(3). According to plaintiffs, defendant FCCC "operates for the economic benefit of several affiliated for-profit companies and the individuals who own and control those for-profit companies." Compl. ¶ 41. Defendant FCCC–2, which was incorporated as a non-profit on March 3, 2005, one day after the Court ordered defendants to turn over plaintiff Baker's file, allegedly filed for non-profit status in order to "evade liability for the claims of consumers alleged in this case and to protect the profits made by defendants." [18]

---

**18.** According to plaintiff, FCCC–2 is operating as an alter-ego to FCCC; both defendants have the same place of business and the same officers and directors. The Articles of Incorporation for FCCC–2 state that the "exclusive purpose" of the non-profit, entitled "FCCC Services, Inc." is to "provid[e] administrative services to Family Credit Counsling [sic] Corporation." Compl. ¶ 5.

*Id.* ¶¶ 5, 92. Plaintiffs also allege that both FCCC and FCCC–2 distribute funds to the other defendant for-profit companies. *Id.* ¶ 32.

■ In short, plaintiffs allege that defendants FCCC and FCCC–2 are operating for the financial benefit of the other individual and corporate defendants. Because plaintiffs have alleged that defendants FCCC and FCCC–2 are not operated exclusively for one or more 501(c)(3) purposes, such as charitable or educational purposes, as required by 26 C.F.R. § 1.501(c)(3)–1(a)(1), the Court will allow the claims against those defendants to proceed under the CROA notwithstanding their 501(c)(3) status.[19]

In reaching this conclusion, the Court acknowledges and agrees with the reasoning of the district court in *Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F.Supp.2d 539 (D.Md.2005), which held that

> [b]y the implicit language of the Internal Revenue Code and the explicit language of the Code of Federal Regulations, a corporation must not only be organized as a non-profit, it must actually operate as one. To the extent that it does not, it may be held subject to CROA whether

or not the IRS has granted it § 501(c)(3) status.

*Id.* at 550. Moreover, in the first (and only) Court of Appeals opinion to address whether a non-profit may be held liable under the CROA, the First Circuit held that 501(c)(3) classification by the IRS was not dispositive in deciding whether an organization was exempt from the CROA. *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473 (1st Cir.2005). That court allowed plaintiffs' claim against a non-profit credit repair organization to proceed because the plaintiffs had alleged that the defendant was not operating as a non-profit.[20] *Id.* at 478–79; *but see Limpert,* 328 F.Supp.2d at 365 (dismissing CROA claims against organizations with 501(c)(3) status).[21]

The Court recognizes that Congress explicitly exempted from the CROA "any nonprofit organization which is exempt from taxation under section 501(c)(3)." 15 U.S.C. § 1679a(3)(B)(i). However, allowing plaintiffs' CROA claim to proceed against the two non-profit defendants, FCCC and FCCC–2, does not subvert Congressional intent. First, Congress was presumably aware of the relevant tax law when it enacted the CROA, including the two-part requirement for 501(c)(3) status,

---

19. While the Court lacks power to enter a declaratory judgment regarding defendants' 501(c)(3) status, *see* 28 U.S.C. § 2201(a), 26 U.S.C. § 7428(a) (limiting jurisdiction over declaratory judgments regarding 501(c)(3) status to the United States Tax Court, the United States Court of Federal Claims, and the District Court for the District of Columbia), the Court does have jurisdiction to review an entity's 501(c)(3) status as part of a lawsuit. *Richie v. Am. Council on Gift Annuities*, 943 F.Supp. 685, 691–92 (N.D.Tex.1996); *Stern & Co. v. State Loan & Finance Corp.*, 205 F.Supp. 702, 706 (D.Del.1962) ("This Court may not determine tax liability, but it may determine facts which may have a direct, even immediate bearing on what the tax liability will be.").

20. The plaintiffs in *Zimmerman* alleged that the primary purpose of defendant was to make money for its owners, and that the owners received significant compensation packages. 409 F.3d 473, 479 (1st Cir.2005).

21. *Limpert* relied on the district court opinion in *Zimmerman* for guidance, which refused to look behind a credit repair organization's 501(c)(3) status for purposes of CROA liability. *Zimmerman v. Cambridge Credit Counseling Corp.*, 322 F.Supp.2d 95, 101 (D.Mass. 2004). That holding was overruled by the First Circuit Court of Appeals. *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473 (1st Cir.2005).

organization and operation as a non-profit. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives ... know the law."). Thus, the Court concludes that Congress did not intend to exempt organizations from the CROA which are not operating as non-profits. Moreover, one of the purposes of the CROA is to "protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2). Allowing plaintiffs to sue two entities allegedly incorporated as non-profits in order to shield themselves from liability furthers Congressional intent.[22] *See* Compl. ¶ 4 (alleging that FCCC was incorporated as a 501(c)(3) to evade liability under the CROA).

### 5. Plaintiffs may allege CROA violations against all defendants

Defendants argue that plaintiffs may only allege CROA violations against defendants FCCC and CDME, the defendants with whom plaintiffs had contracts for DMPs. The Court rejects this argument.

 While plaintiffs only contracted with defendants FCCC and CDME, they allege that all defendants are connected to those defendants' violations of the CROA. Plaintiffs allege that defendants FCCC, FCCC–2, CDME, and Debt Solutions all played some role in providing DMPs to plaintiffs. Compl. ¶ 2. They further allege that defendant Vegga directs prospective customers to the services provided by defendants FCCC and Debt Solutions, which

include DMPs. *Id.* ¶ 11. Plaintiffs also allege that defendants JRA Property, Consumer Financial Marketing, and Vegga received money from defendant FCCC which FCCC obtained in violation of the CROA. *Id.* ¶ 32. Individual defendants Armstrong and Gelman are officers, directors, shareholders, and founders of FCCC, and Armstrong is an officer, director, founder, and manager of CDME, the two defendant organizations which provided the DMPs and allegedly violated the CROA. *Id.* ¶¶ 44–45. Armstrong is also an officer, director, founder, and/or manager of Top Financial Sales, which was allegedly created to protect defendants' profits in response to this suit being filed. *Id.* ¶¶ 33, 49.

According to plaintiffs, the CROA violations were carried out by and through each of the named defendants. At this stage of the proceedings, plaintiffs have made sufficient allegations to claim that each defendant violated the CROA. *See Hanrahan v. Britt,* 1995 WL 422840, at *8 (E.D.Pa. July 11, 1995) (holding that plaintiffs could bring federal and common law claims against all defendants where plaintiffs had alleged that the unlawful conduct "was carried out by and through defendants' business organizations, which organizations are comprised of and include defendants individually, the various corporations and entities through which defendants conduct their respective businesses, and the employees, agents and representatives of defendants' respective business organizations"). Accordingly, plaintiffs may sue each defendant for violations of the CROA.

**22.** There is evidence, in fact, that credit repair organizations are doing exactly that: obtaining 501(c)(3) status in order to avoid legal liability. *See* Marta Lugones Moakley, *Credit Repair Organizations After Regulation,* 77–Aug. Fla. B.J. 28, 33 (2003) (describing the increase in the number of credit repair organizations seeking 501(c)(3) status after the passage of the CROA); *see also Section 501(c)(3)*

*Credit Counseling Organizations: Hearing Before the House of Representatives Ways and Means Subcommittee on Oversight,* 108th Cong. (2003); *Profiteering in a Non–Profit Industry: Abusive Practices in Credit Counseling: Hearing Before the Senate Governmental Affairs Subcommittee on Investigations,* 108th Cong. (2004).

B. *RICO Claim—Counts Two and Three*

**1. RICO elements and requirements**

Count Two of plaintiffs' Complaint alleges that defendants violated the Racketeer Influenced and Corrupt Organizations (RICO) Act. Compl. ¶¶ 171–183. In Count Three plaintiffs aver that defendants conspired to violate RICO. *Id.* ¶¶ 184–190. Defendants challenge the adequacy of these allegations.

RICO was enacted in 1970 and provides a private right of action for any person injured by one of RICO's prohibited activities. 18 U.S.C. § 1964(c). As outlined in § 1962, the prohibited activities include

> [U]se of income derived from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; the acquisition or maintenance of any interest in an enterprise "through" a pattern of racketeering activity; conducting or participating in the conduct of an enterprise through a pattern of racketeering activity; and conspiring to violate any of these provisions.

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 482–83, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Recovery in a civil RICO suit entitles a plaintiff to treble damages and attorneys' fees. 18 U.S.C. § 1964(c).

■ In order to state a civil claim under RICO, a plaintiff must allege the following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275. Plaintiffs must also allege an injury resulting from the pattern of racketeering. *Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir.2002). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity" or a "group of individuals associated in fact although not a legal entity." [23] 18 U.S.C. § 1961(4). "Racketeering activity" means one of the predicate acts enumerated at 18 U.S.C. § 1961(1), which include mail and wire fraud, the predicate acts alleged in the instant case. *Id.*

The Court will further elaborate on these elements in the sections below as they relate to defendants' arguments.

**2. Defendants' Arguments**

Defendants first argue that plaintiffs' RICO claim does not alleged a pattern of racketeering activity. Def. Memo. at 40. Next, defendants argue that plaintiffs have failed to allege predicate fraudulent acts with sufficient specificity, and that plaintiffs Contessa, Jack, Scott, and Smith have not alleged any fraudulent acts. *Id.* at 39. Defendants' final contention is that plaintiffs Contessa, Jack, Scott, and Smith cannot establish reasonable reliance upon defendants' supposed misrepresentations. *Id.* at 41; Def. Reply at 6. Based on these arguments, defendants assert that plaintiffs' RICO conspiracy claim must also be dismissed. Def. Memo. at 42.

**3. Plaintiffs have alleged a pattern of racketeering activity**

■ A "pattern of racketeering activity" requires at least two predicate acts that are related and pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "Predicate acts are related if the acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated

---

**23.** In the Complaint, plaintiffs identify the "enterprise" as FCCC and FCCC-2. Compl. ¶ 173. The other defendants are defined as "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise. Compl. ¶ 174. Defendants do not contest the legal merits or sufficiency of these allegations.

by distinguishing characteristics and are not isolated events." *United States v. Pelullo*, 964 F.2d 193, 207–08 (3d Cir.1992). Regarding the "threat of continued criminal activity," a party may allege either closed- or open-ended continuity. *H.J., Inc.*, 492 U.S. at 241, 109 S.Ct. 2893. Close-ended continuity requires a series of related predicates occurring over a "substantial period of time." *Id.* at 242, 109 S.Ct. 2893; *Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 609 (3d Cir. 1991). A "substantial period of time" is a period at least greater than twelve months. *Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir.1995) ("[T]his court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for close-ended continuity."); *Heller v. Deutsche Bank AG*, 2005 WL 525401, at *5 (E.D.Pa. March 3, 2005) ("Indeed, with respect to a close-ended scheme, the Third Circuit has developed a durational requirement of at least twelve months."). Open-ended continuity may be shown if the predicate acts are a means by which defendants regularly conduct their business. *H.J., Inc.*, 492 U.S. at 243, 109 S.Ct. 2893; *Hughes*, 945 F.2d at 610 (defining open-ended continuity as regularly using fraud to conduct a business).

Plaintiffs' Complaint alleges more than two predicate acts of mail and wire fraud with regard to each individual plaintiff,[24] meeting the two act requirement for a pattern of racketeering activity.[25] These acts were related, as they had similar purposes (to establish DMPs), participants (FCCC and CDME), victims (individuals in debt), results (taking money for DMPs that was never given to creditors), and methods of commission (use of similar websites and sales pitches). *See Tabas*, 47 F.3d at 1292 ("Predicate acts are related if the acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.") (quoting *H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. 2893).

Plaintiffs have also alleged that defendants' predicate acts pose a threat of continued criminal activity. The first predicate act alleged by any plaintiff was a telephone call from defendant FCCC to plaintiff Baker on March 12, 2003. Compl. ¶ 142(d). The last predicate act alleged by any plaintiff was a mailing or facsimile from defendant FCCC to plaintiff Scott on February 23, 2005. *Id.* ¶ 150(c). Thus, plaintiffs have alleged predicate acts lasting over a period of almost twenty-four months, which the Court concludes is a sufficiently substantial period of time to demonstrate close-ended continuity. Moreover, plaintiffs have alleged open-ended continuity, as they contend that defendants regularly conduct their business through these predicate acts. Specifically, plaintiffs state that defendants "are *in business* to make money by inducing unsuspecting consumers to pay exorbitant up-front and monthly fees for debt management plans that defendants will never implement, or will implement so belatedly and improperly that consumers are harmed rather than helped," and that "[d]efendants' acts, practices, and *course of business* were designed to and did result in the perpetration of a fraud and decep-

---

24. As discussed in section III(B)(4) *infra*, plaintiffs allege these predicate acts with sufficient particularity.

25. For example, on December 18, 2003, plaintiff Baker received a "Welcome Package" by mail from defendant FCCC. Compl. ¶ 145(e). This package allegedly contained several misrepresentations. *Id.* Each plaintiff received similar "Welcome Package" or "Sign Up Package" in the mail with the same misrepresentations. *Id.* ¶¶ 147(c), 148(e), 149(c), 150(c).

tion upon consumers." *Id.* ¶¶ 8, 35 (emphasis added).

Therefore, the Court concludes that plaintiffs have alleged a pattern of racketeering activity by alleging more than two predicate acts that are related and pose a threat of continued criminal activity.

### 4. Plaintiffs have alleged predicate acts with sufficient particularity

 When mail or wire fraud is the predicate act alleged in a civil RICO case, as both are in the instant case, the heightened pleading requirements of Fed. R.Civ.P. 9(b) apply. *Warden,* 288 F.3d at 114. To meet these requirements, plaintiffs must plead the predicate acts of mail and wire fraud with sufficient particularity in order to place defendants on notice of the "precise misconduct with which they are charged." *Seville Indus. Mach. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). Plaintiffs are generally required to plead the "who, what, when and where details of the alleged fraud." *Allen Neurosurgical Assocs. v. Lehigh Valley Health Network,* 2001 WL 41143, at *3 (E.D.Pa. Jan.18, 2001) (internal citation omitted).

 The Court concludes that plaintiffs have met the pleading specificity requirements. The Complaint provides numerous detailed allegations of fraudulent mail and wire transactions between FCCC, CDME, and plaintiffs. For example, plaintiffs allege:

> On December 18, 2003, as part of defendants' welcoming package, Jasmine Feebles sent via facsimile to Baker a form entitled 'Questions and Answers about my Debt Management Program,' which falsely represented that creditors are willing to work with the Debt Solutions

and FCCC program because 'We work with over 50,000 creditors.'

Compl. ¶ 145(f).

Most (if not all) of the alleged fraudulent mailings, faxes, e-mails and telephone calls are described in the Complaint with this level of particularity. The allegations give the specific or approximate date of the communication, the name of the defendant or defendant's employee communicating with the plaintiff, and describe in some detail the contents of the communication. These are the who, what, when and where details required by Rule 9(b). *Compare Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658–59 (3d Cir.1998) (finding that "when, by whom, and to whom a mailing was sent, and the precise content of each mailing" were not sufficiently detailed and thus the Rule 9(b) specificity requirement was not met). The Court concludes that plaintiffs' allegations of mail and wire fraud are sufficiently particular to meet the requirements of Rule 9(b).

### 5. Plaintiffs Contessa, Jack, Scott, and Smith have alleged fraudulent acts and reliance on those acts

Defendants argue that plaintiffs Contessa, Jack, Scott and Smith have not alleged that defendants engaged in fraudulent acts as required to state RICO predicate acts. Furthermore, defendants argue that these four plaintiffs cannot establish reasonable reliance upon the supposed misrepresentations, because each was aware of how the DMPs functioned.[26] (Defendants do not make these arguments with respect to plaintiff Baker.)

 Allegations of wire and mail fraud as the predicate acts in a RICO case must

---

**26.** Defendants argue that each plaintiff received documents explaining how the DMP worked, including the fact that the first payment was a fee refundable only in limited circumstances. Def. Memo. at 41.

include the elements of criminal fraud: a scheme to defraud, use of the telephone or mail to conduct the fraudulent scheme, and an intent to conduct the fraudulent scheme. *United States v. Hannigan*, 27 F.3d 890, 892 (3d Cir.1994) (listing these as the elements required to support a conviction under the mail fraud statute); *Werther v. Rosen*, 2002 WL 31955983, at *2 (E.D.Pa. Oct.30, 2002). Additionally, "most courts now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case," *Cooper v. Broadspire Servs., Inc.*, 2005 WL 1712390, at *8 n. 7 (E.D.Pa. July 20, 2005), although there is no definitive Third Circuit case on the subject.[27] *Nolan v. Galaxy Scientific Corp.*, 269 F.Supp.2d 635, 641 (E.D.Pa. 2003) (noting lack of clarity in Third Circuit precedent on reliance and mail fraud).

The Court concludes that the Complaint alleges all three elements of fraud with respect to plaintiffs Contessa, Jack, Scott and Smith. Throughout the Complaint, plaintiffs allege that defendants engaged in a scheme to defraud. *See* Compl. ¶¶ 1 (describing a "scheme" to "appropriate hundreds of dollars from individual consumers under the guise of 'debt management' "), 76 (describing fraudulent misrepresentations "[i]n furtherance of the scheme to defraud"). Plaintiffs repeatedly allege that defendants used both the telephone and mail to conduct the fraudulent scheme. For example:

- CDME, in a phone conversation on or about January 27, 2004, represented to Contessa that her first $319.00 payment to the DMP would go directly to her creditors. Compl. ¶ 147(b).

- CDME called Jack on November 4, 2004, and represented that participating in defendant's debt consolidation program would "help her credit score." *Id.* ¶ 148(b).

- FCCC told Smith in a phone conversation on or about July 23, 2003 that defendant would "help raise her credit score," that defendant would obtain a lower interest rate if Smith enrolled in a DMP, and that the *initial* $299.00 payment would go directly to Smith's creditors. *Id.* ¶ 149(b).

- CDME, in a phone call on or about February 23, 2005, represented to Scott that participating in a DMP would help her credit and that the first payment of $397.00 would go directly to her creditors. *Id.* ¶ 150(b).

Plaintiffs also allege that faxes and mailings sent by defendants were used to further these fraudulent activities. *Id.* ¶¶ 147(c) (fax to plaintiff Contessa), 148(f) (mailing to plaintiff Jack), 149© (fax to plaintiff Smith), 150(c) (mailing to plaintiff Scott). Finally, plaintiffs allege that defendants intended to defraud plaintiffs. *Id.* ¶¶ 76 (stating that defendants intend to mislead consumers), 78 (stating that defendants intended to keep plaintiffs' payments for themselves). Thus, the Court concludes that these four plaintiffs have alleged the essential elements of mail and wire fraud.

Plaintiffs Contessa, Jack, Smith, and Scott have also alleged that they relied on defendants' misrepresentations. Plaintiffs allege that: "[i]n reliance on the representations made by defendants ... each of

**27.** Currently the circuits are split as to whether reliance must be shown when fraud is a predicate act. *See Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666 n. 3 (9th Cir.2004) (noting circuit split). In its latest statement on RICO, the Supreme Court declined to address this issue. *Anza v. Ideal Steel Supply Co.*, —— U.S. ——, 126 S.Ct. 1991, 1998, 164 L.Ed.2d 720 (2006) (stating that because plaintiff had not satisfied the proximate-cause requirement for fraud, "we have no occasion to address the substantive question of whether a showing of reliance is required").

the representative plaintiffs also authorized defendants to make automatic withdrawals ranging in amounts of $153.00 to $397.00 from their bank accounts on a monthly basis," *id.* ¶ 118; that defendants' misrepresentations "induced" them to enroll in the DMPs, *id.* ¶ 16; and that consumers were "entice[d] to enter into fiduciary relationships with defendants and participate in defendants' DMPs by misrepresenting that consumers' plans will be serviced by legitimate non-profit consumer counseling institutions with extensive experience." *Id.* ¶ 90. These allegations are sufficient to meet the reliance element for predicate mail and wire fraud acts in a RICO complaint. Moreover, nothing about plaintiffs' reliance was unreasonable, as defendants contend. While defendants argue that each plaintiff was aware of how the DMPs worked, including the fact that the sign-up fee was a generally non-refundable fee for the defendants' services, plaintiffs allege that they were told by defendants' representatives that the fee would be used to pay their creditors. *See,* *e.g., id.* ¶ 147(b) (CDME representative told plaintiff Contessa that her $319.00 sign-up fee would be paid directly to her creditors). At this point of the litigation, the Court accepts plaintiffs' allegations of reliance as reasonable.

Therefore, for the reasons stated above, the Court will not dismiss plaintiffs' civil RICO claims against defendants.

### 6. Plaintiffs have alleged a RICO conspiracy claim

Defendants argue that because plaintiffs fail to state a claim for civil RICO, their RICO conspiracy claims must also be dismissed. That argument is rejected because, as discussed above, the Court concludes that plaintiffs have alleged the elements of a civil RICO claim. Moreover, plaintiffs have alleged the elements of a RICO conspiracy claim. Under 18 U.S.C. § 1962(d), a plaintiff alleging a RICO conspiracy must state that defendants conspired to violate one of the substantive RICO provisions, §§ 1962(a), (b), or (c). *See Smith v. Berg,* 247 F.3d 532, 538 (3d Cir.2001) ("[A] defendant may be held liable for conspiracy to violate [RICO] section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."). Plaintiffs allege that the defendants "knowingly and wilfully" "joined together to accomplish the RICO violations set forth" in Count Two of the Complaint. Compl. ¶¶ 185, 188–89. Although plaintiffs do not specifically identify the RICO provision defendants are alleged to have violated, they use the language of § 1962(c) in the Complaint. *See* Compl. ¶ 175 (alleging that defendants conducted the affairs of the enterprise through a pattern of racketeering activity). The Court concludes that plaintiffs' allegations of a RICO conspiracy are sufficient to withstand a motion to dismiss.

### C. Pennsylvania Unfair Trade Practices and Consumer Protection Law Claim—Count Four

### 1. Pennsylvania's Unfair Trade Practices and Consumer Protection Law

Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) makes it unlawful for individuals or businesses to engage in unfair or deceptive acts or practices. 73 Pa. Cons.Stat. § 201–3. The purpose of the UTPCPL is to ensure fairness in market transactions and to place sellers and consumers on equal ground. *Com. v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812, 816 (1974); *see also Gilmour v. Bohmueller,* 2005 WL 241181, at *11 (E.D.Pa. Jan.1, 2005). The statute is to be liberally interpreted in order to effectuate its purpose.

*Monumental Properties*, 329 A.2d at 816; *Cavallini v. Pet City and Supply*, 848 A.2d 1002, 1004 (Pa.Super.2004). Under the statute, "unfair or deceptive acts or practices" consists of a variety of actions. Those relevant to defendants, as argued by plaintiffs, are:

- Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services, 73 Pa. Cons.Stat. § 201–2(4)(ii);
- Representing that goods or services have ... characteristics ... uses [or] benefits ... that they do not have, § 201–2(4)(v); and,
- Knowingly misrepresenting that services ... are needed if they are not needed, § 201–2(4)(xv).

Compl. ¶ 195.

What a plaintiff must include in a complaint in order to allege a violation of the UTPCPL depends on which section of the UTPCPL a defendant allegedly violated. Sections (ii) and (v) of the UTPCPL prohibit false advertising.[28] *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 10 (Pa.Super.2004). In order to state a violation of section (ii), a plaintiff must allege that the defendant's representations were likely to cause confusion or misunderstanding. *DiLucido v. Terminix Int'l, Inc.*, 450 Pa.Super. 393, 676 A.2d 1237, 1240 (1996). To allege a violation of section (v) of the UTPCPL, a plaintiff must allege that the advertisement is false, "that it actually deceives or has a tendency to deceive a substantial segment of its audience, and that the false advertising is likely to make a difference in the purchasing decision." *Id.* at 1240–41. Moreover, in order to allege a violation of any provision of the UTPCPL,

a plaintiff must allege that she justifiably relied on defendant's act or practice, and that she suffered an ascertainable loss as a result. *Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 140–41 (3d Cir.2005); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 438 (2004). Thus, in order to state a cause of action under any provision of the UTPCPL, including sections (ii) and (v), plaintiffs must allege both reliance and causation. *Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir.2005).

Plaintiffs also allege that defendants violated section (xv) of the UTPCPL, a section which is more akin to fraud than false advertising. *See Weisblatt v. Minn. Mutual Life Ins. Co.*, 4 F.Supp.2d 371, 385 (E.D.Pa.1998) (denying claim under section (xv) because plaintiff could not prove the elements of common-law fraud). A plaintiff suing under any of the fraud provisions of the UTPCPL must allege the elements of common law fraud. *Sponaugle v. First Union Mortg. Corp.*, 40 Fed.Appx. 715, 718 (3d Cir. July 25, 2002) (unpublished); *Gilmour*, 2005 WL 241181, at *11. Therefore, a plaintiff alleging a violation of section (xv) of the UTPCPL must show a material misrepresentation of an existing fact, scienter, justifiable reliance, and damages. *Gilmour*, 2005 WL 241181, at *11; *Prime Meats, Inc. v. Yochim*, 422 Pa.Super. 460, 619 A.2d 769, 773 (1993).

### 2. Defendants' Arguments

Defendants argue that plaintiffs have not sufficiently pled the elements of a claim under the UTPCPL. Def. Memo. at 45–46. Defendants also argue that plaintiffs Scott, Smith, Jack and Contessa, who

---

**28.** The acts prohibited by the entirety of the UTPCPL "encompass[] an array of practices which might be analogized to passing off, misappropriation, trademark infringement, disparagement, false advertising, fraud, breach of contract, and breach of warranty." *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 10 (Pa.Super.2004) (quoting *DiLucido v. Terminix Int'l, Inc.*, 450 Pa.Super. 393, 676 A.2d 1237, 1241 (1996)).

are not residents of Pennsylvania, cannot bring suit under the UTPCPL. *Id.* at 45–46.

### 3. Plaintiffs have alleged the elements of UTPCPL claims for both false advertising and fraud

■ In their false advertising claim under sections (ii) and (v) of the UTPCPL, plaintiffs allege that defendants caused a "likelihood of confusion or misunderstanding as to the sponsorship, affiliation, connection with, association with or certification of DMPs and debt counseling services." Compl. ¶ 195(a). Plaintiffs also allege that defendants represented that "enrollment in defendants' so-called DMPs had certain characteristics, uses and/or benefits that they do not have and that consumers would receive debt counseling services that they did not receive." *Id.* ¶ 195. These two claims allege violations of UTPCPL sections (ii) and (v). Plaintiffs also allege that they relied on defendants' representations, and that because defendants "had contracted to act as fiduciaries for plaintiffs ... pursuant to the DMPs and the Limited Powers of Attorney," plaintiffs were entitled to rely on defendants' representations. *Id.* ¶ 196. Finally, plaintiffs allege that "[a]s a direct and proximate result" of defendants' conduct they suffered ascertainable losses. *Id.* ¶ 197. Therefore, plaintiffs have alleged the requisite elements for their deceptive advertising claim under the UTPCPL— representations likely to cause confusion, a false advertisement, justifiable reliance, and damages.

■ Regarding their fraud claim under UTPCPL section (xv), plaintiffs allege that defendants "[k]nowingly represented that consumers needed services for debt management and counseling which were not needed." *Id.* ¶ 195(c). This misrepresentation was material, as it went to the heart of the services defendants provided to plaintiffs. Plaintiffs further state that the misrepresentations were made "knowing[ly]," which meets the scienter requirement.[29] *Id.* Finally, plaintiffs also allege that they justifiably relied on these representations, and that they suffered losses as a direct result of that reliance. *Id.* ¶¶ 196–97. These allegations satisfy the requirements for pleading common law fraud as required in a claim under section (xv) of the UTPCPL.

### 4. The non-resident plaintiffs—Contessa, Jack, Scott, and Smith—cannot sue under UTPCPL

■ There is no decision by a Pennsylvania state court limiting application of the UTPCPL to Pennsylvania residents.[30] Nevertheless, applying federal law, the Court agrees with defendants that the UTPCPL provides a remedy only to Pennsylvania residents. Thus, non-Pennsylvania residents Contessa, Jack, Scott, and Smith do not have a cause of action under the UTPCPL.

Honorable Anita B. Brody of this District addressed a similar problem in *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D.Pa.2000), a case in which the plaintiff filed a putative class action for violations of

---

**29.** In fact, throughout the Complaint plaintiffs repeatedly allege that defendants acted intentionally. *See, e.g.,* Compl. ¶ 24 ("[D]efendants intentionally act to lull customers into believing that defendants are paying down the debts of consumers.").

**30.** The Court notes that class actions in Pennsylvania state courts specifically define the

class as consisting of Pennsylvania residents. *See, e.g., Basile v. H & R Block, Inc.,* 777 A.2d 95, 99 (Pa.Super.2001) ("The court delineated the class as 'All Pennsylvania residents ...' "); *O'Neill v. Sovereign Bank,* 1998 WL 1543498, at *10 (Pa.Com.Pl. Dec.15, 1998) ("The class shall consist of all Pennsylvania residents ...").

state consumer fraud statutes. *Id.* at 208. The court held that the UTPCPL could not be applied to putative class members who were not residents of Pennsylvania. *Id.* at 213 ("Putative class members have a due process right to have their claims governed by state law applicable to their dispute.").

The only distinction between *Lyon* and the instant case is that *Lyon* decided whether the UTPCPL applied to *putative* class members who were non-Pennsylvania residents, while in the instant case the Court must decide whether the UTPCPL applies to *named* class members who are non-Pennsylvania residents. This distinction is irrelevant in the context of this case.

States have a strong interest in applying their own consumer protection laws to their citizens. *See Lyon,* 194 F.R.D. at 215 ("State consumer fraud acts are designed to either protect state residents or protect consumers engaged in transactions within the state."); *Lewis v. Bayer AG,* 2004 WL 1146692, at *12 (Pa.Com.Pl. Nov.18, 2004)("State consumer protection acts are designed to protect the residents of the state in which a deceptive act occurs or the individual resides and therefore the state where the individual resides has an overriding interest in applying the law of that state."). To this end, federal courts in other jurisdictions have refused to apply the UTPCPL to non-residents of Pennsylvania. *See In re Adelphia Communications Corp.,* 331 B.R. 93, 97–98 (S.D.N.Y. 2005); *Karnuth v. Rodale,* 2005 WL 1683605, at *4 (W.D.Va. July 18, 2005). Similarly, when district courts have faced the problem of nationwide classes which seek to apply state consumer protection laws, those courts have refused to certify a class, in part because choice of law would require applying the consumer protection law of each class member's home state. *See, e.g., In re Prempro,* 230 F.R.D. 555,

568 (E.D.Ark.2005); *Karnuth,* 2005 WL 1683605, at *5; *Carpenter v. BMW of North America, Inc.,* 1999 WL 415390, at *3 (E.D.Pa. June 21, 1999); *Tylka v. Gerber Products Co.,* 178 F.R.D. 493, 498 (N.D.Ill.1998); *Lewis,* 2004 WL 1146692, at *15.

For all of the foregoing reasons, the Court grants defendants' motion to dismiss the UTPCPL claims of plaintiffs Contessa, Jack, Scott, and Smith. The UTPCPL claim of plaintiff Baker, a Pennsylvania resident, will be allowed to proceed.

### D. *Breach of Fiduciary Duty Claim—Count Five*

#### 1. Elements of breach of fiduciary duty

■ To allege a breach of fiduciary duty, a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants. *Harold v. McGann,* 406 F.Supp.2d 562, 571 (E.D.Pa.2005). "Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Silver v. Silver,* 421 Pa. 533, 219 A.2d 659, 662 (1966); *see also Basile v. H & R Block, Inc.,* 777 A.2d 95, 101–02 (Pa.Super.2001).

■ In addition to a confidential relationship, a plaintiff must also allege the elements of a breach of fiduciary duty:

(1) That the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;

(2) That the plaintiff suffered injury; and

(3) The defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries.

Pa. S.S.J.I. § 4.16; *see also McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998).

██ A plaintiff may also allege a civil cause of action, such as breach of fiduciary duty, against any defendant who conspired to commit that tort. In order to allege a civil conspiracy under Pennsylvania law a plaintiff must aver that two or more defendants agreed with the intent to commit "an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979). The plaintiff must also allege an overt act in furtherance of the common purpose and actual legal damage. *BMB Assocs. v. Ortwein*, 1994 WL 314330, at *7 (E.D.Pa. June 29, 1994). An unlawful act includes "a violation of civil or criminal law." Black's Law Dictionary 1574 (8th ed.2004). So long as the alleged act gives rise to a civil cause of action, there is a cause of action for civil conspiracy to commit that act. *Compare Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F.Supp.2d 400, 411 (W.D.Pa.2002) ("It is true under Pennsylvania law that absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act."); *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa.Super.2004) (same).

### 2. Defendants' arguments

Defendants argue that plaintiffs have failed to allege a relationship with any defendants other than CDME and FCCC. Def. Memo. at 44. Further, defendants aver that the Complaint is "devoid of facts to establish a breach of fiduciary duty

claim." *Id.* Defendants also argue that because plaintiffs have asserted an action for breach of contract, their claim for breach of fiduciary duty is barred by the gist of the action doctrine. *Id.* at 44–45.

### 3. Plaintiffs have alleged a fiduciary relationship with defendants FCCC and CDME

██ The Court concludes that each plaintiff has alleged a confidential relationship with either FCCC or CDME.[31] The "essence" of such a relationship is "trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other." *In re Estate of Scott*, 455 Pa. 429, 316 A.2d 883, 885 (1974). Plaintiffs allege that they trusted defendants to establish DMPs and to pay off their creditors. Compl. ¶ 181(a). With respect to this allegation, plaintiffs point to the fact that they gave defendants limited power of attorney to act as their "fiduciary" and the authority to withdraw funds from their checking accounts. *Id.* ¶¶ 111, 118. Plaintiffs contend that these authorizations allowed defendants to abuse plaintiffs' trust by withdrawing funds from plaintiffs' checking accounts and keeping those funds for their personal gain. On this issue, the Court notes that the limited powers of attorney, standing alone, are insufficient to establish a confidential relationship between plaintiffs and defendants. *See Transamerica Ins. Fin. Corp. v. Pennmed Consultants, Inc.*, 1996 WL 605131, at *5 (E.D.Pa. Oct.18, 1996) ("[T]he mere existence of a power of attorney may be insufficient to establish a confidential or fiduciary relationship."); *In re Ziel's Estate*, 467 Pa. 531, 359 A.2d 728, 734 (1974).

In an analogous case, a Pennsylvania appellate court concluded that a confiden-

---

31. Plaintiffs Baker and Smith contracted with defendant FCCC; plaintiffs Contessa, Jack and Scott contracted with defendant CDME.

tial relationship existed between defendant H & R Block, a mass-market tax preparation service, and its customers. *Basile v. H & R Block, Inc.*, 777 A.2d 95 (Pa.Super.2001). That determination was based on the fact that H & R Block had actively sought the trust of customers, cultivating their business through a media campaign focusing on defendant's expertise and trustworthiness. *Id.* at 103–04. Furthermore, the customers entered the relationship with defendant in a position of "pronounced economic and intellectual weakness." *Id.* at 105. Thus, the court ruled that a jury could reasonably find that plaintiffs and defendant had a confidential relationship. *Id.* at 106.

Plaintiffs allege in this case that defendants engaged in practices similar to those of H & R Block in the *Basile* case by actively seeking the trust of plaintiffs, telling plaintiffs that they employ "experienced and acclaimed" credit counseling professionals, and explaining that plaintiffs' accounts would be handled by defendants' non-profit affiliate, which is "required to adhere to full disclosure and meet stricter specifications." Compl. ¶ 6. Like the customers in *Basile*, plaintiffs came to defendants in a position of economic weakness, as they were already in debt.[32] Therefore, the Court concludes that the Complaint alleges a confidential relationship between plaintiffs and defendants FCCC and CDME.

### 4. Plaintiffs have alleged the elements of breach of fiduciary duty against defendants FCCC and CDME

Regarding defendants' contention that the Complaint is "devoid of facts to establish a breach of fiduciary duty claim," Def. Memo. at 44, the Court again notes that at the motion to dismiss stage of a case, plaintiffs need not "establish" anything. *McFerron v. L.R. Costanzo Co.*, 2003 WL 22740938, at *3 (M.D.Pa. Sept.10, 2003) ("At this stage of the proceedings, with a motion to dismiss pending, the plaintiff need not 'establish' any facts."). Moreover, plaintiffs have alleged the elements of a breach of fiduciary duty by defendants FCCC and CDME: negligently or intentionally failing to act in good faith and solely for the benefit of plaintiff, injury to the plaintiff, and causation. Pa. S.S.J.I. § 4.16. Plaintiffs also state that defendants intentionally and wilfully failed to act in good faith, and that plaintiffs were directly injured as the result of defendants' actions. Compl. ¶¶ 201–03. These allegations are sufficient to state a claim of breach of fiduciary duty against defendants FCCC and CDME.

### 5. Plaintiffs may sue the other defendants—Debt Solutions, FCCC–2, JRA Property, Top Financial Sales, Consumer Financial, Vegga, Gelman, and Armstrong—for breach of fiduciary duty under a civil conspiracy theory

Plaintiffs do not specifically state that they are alleging a claim of civil conspiracy for breach of fiduciary duty against the other defendants, Debt Solutions, FCCC–2, JRA Property, Top Financial Sales, Consumer Financial, Vegga, Gelman, and Armstrong; instead, they allege that all defendants breached their fiduciary duty to plaintiffs. Compl. ¶¶ 200–03. However, plaintiffs repeatedly allege that defendants "conspired" together,[33] and in their breach of fiduciary claim, they state that all defen-

---

32. For example, plaintiff Baker owed one creditor, PECO Energy, $2,336.00 when she enrolled in defendants' DMP. Compl. ¶ 146(z).

33. For example, plaintiffs allege that "[a]t all material times hereto, the defendants conspired with each other to engage in the various activities set forth herein." Compl. ¶ 103.

dants participated in the "scheme" to defraud consumers.[34] *Id.* ¶ 203.

As stated above, a claim for civil conspiracy requires that a plaintiff allege that two or more defendants agreed with the intent to commit an unlawful act or to do an otherwise lawful act by unlawful means, at least one overt act in furtherance of the common purpose, and actual legal damage. *BMB Assocs.,* 1994 WL 314330, at *7; *Thompson Coal,* 412 A.2d at 472. While no court has specifically held that breach of fiduciary duty is an unlawful act for purposes of a civil conspiracy claim, this Court does so on the ground that breach of fiduciary duty is a basis for a civil cause of action. *See Daniel Boone,* 187 F.Supp.2d at 411 ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.").

In this case, plaintiffs allege that all of the defendants had an implicit agreement to engage in and share receipts from their credit counseling activities, including the provision of DMPs to consumers such as plaintiffs. "At all material times hereto, the defendants conspired with each other to engage in the various activities set forth herein, agreed to participate in the operation of a conspiracy to defraud the named plaintiffs and members of the Class herein, and aided and abetted one another in these activities as described in detail herein." Compl. ¶ 103. Plaintiffs also claim that defendants intended to injure them. "Defendants' participation in the foregoing scheme to defraud consumers demonstrates intentional and willful conduct by the defendants, in reckless disregard of the rights of and fiduciary duties owed to Class members." *Id.* ¶ 203. Further, the Complaint includes allegations that each defendant committed acts in furtherance of the conspiracy. *See, e.g., id.* ¶¶ 42 (defendant Debt Solutions engaged in the marketing of DMPs), 44 (defendant Armstrong controlled, directed, commingled and intermingled funds from the DMPs). Finally, as stated previously, plaintiffs have alleged actual legal damage, as each plaintiff claims loss of some amount of money. *See BMB Assocs.,* 1994 WL 314330, at *7 (defining "actual legal damage" as loss of money). Simply because plaintiffs did not have a fiduciary relationship with the other defendants—Debt Solutions, FCCC–2, JRA Property, Top Financial Sales, Consumer Financial, Vegga, Gelman, and Armstrong—does not mean that those defendants cannot be held liable for breach of fiduciary duty under a civil conspiracy theory. *See Daniel Boone,* 187 F.Supp.2d at 411. Thus, the Court rejects defendants argument that plaintiffs have not asserted a claim against defendants Debt Solutions, FCCC–2, JRA Property, Top Financial Sales, Consumer Financial, Vegga, Gelman, and Armstrong for breach of fiduciary duty.

In the alternative, although not pleaded,[35] plaintiffs may attempt to prove that the other defendants aided and abetted defendants FCCC and CDME in breaching their fiduciary duty to plaintiffs. The elements of a claim of aiding and abetting breach of fiduciary duty under

---

**34.** Moreover, under the liberal pleading standards of the Federal Rules, a plaintiff need not specify each legal theory which entitles her to relief. *See Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 600 (2d Cir.1991) ("[F]ederal pleading is by statement of claim, not by legal theory."); *Asphaltic Enterprises, Inc. v. Baldwin–Lima–Hamilton Corp.,* 39 F.R.D. 574, 577 (E.D.Pa.1966) ("[A]ll that is required of plaintiff is that he place the defendant on notice of the nature of his claim. . . . He need not specify his theory of recovery.").

**35.** "A court is not limited to granting relief to a party solely on the basis of theories of recovery set forth in the pleadings." *Evans Prods. Co. v. West Am. Ins. Co.,* 736 F.2d 920, 923 (3d Cir.1984).

Pennsylvania law are: (1) a breach of fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and, (3) substantial assistance or encouragement by the aider and abettor in effecting that breach. *Pierce v. Rossetta Corp.*, 1992 WL 165817, at *8 (E.D.Pa. June 12, 1992); *Koken v. Steinberg*, 825 A.2d 723, 732 (Pa.Commw.2003).

### 6. The gist of the action doctrine

Defendants' final challenge to plaintiffs' breach of fiduciary duty claim is that the claim is barred by the gist of the action doctrine. The Court disagrees.

#### a. *Description of the gist of the action doctrine*

■ The purpose of the gist of the action doctrine is to maintain the conceptual distinction between contract and tort claims. *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.2002). "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." *Bash v. Bell Tel. Co.*, 411 Pa.Super. 347, 601 A.2d 825, 829 (1992). A tort claim is barred by the gist of the action doctrine "if it arises solely from a contract between the parties, if the duties allegedly breached were grounded in the contract itself, or if the claim's success is wholly dependent on the terms of a contract." *Ginley v. E.B. Mahoney Builders,*

*Inc.*, 2005 WL 27534, at *2 (E.D.Pa. Jan.5, 2005). A breach of fiduciary duty claim may be barred by the gist of the action doctrine. *Jodek Charitable Trust, R.A. v. VerticalNet Inc.*, 412 F.Supp.2d 469, 479–80 (E.D.Pa.2006) (dismissing breach of fiduciary duty claim because it replicated breach of contract claim); *Ginley*, 2005 WL 27534, at *2 (dismissing breach of fiduciary duty claim because of gist of the action doctrine).[36] At this stage of the litigation, "[c]aution must be exercised in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry." *Haymond v. Lundy*, 2000 WL 804432, at *8 (E.D.Pa. June 22, 2000).

#### b. *Plaintiffs' claims are not barred by the gist of the action doctrine*

■ In the instant case, plaintiffs' breach of contract claim is based on defendants' "not negotiating lower interest rates for Class members, not making reasonable effort to negotiate lower interest rates, not promptly paying creditors the amounts specified in Class members' DMPs, and not truthfully and promptly communicating with Class members about the status of their DMPs or payments to creditors." Compl. ¶ 208. Plaintiffs' breach of fiduciary duty claim is based on defendants' "engaging in self dealing for their own benefit and against the interests of plaintiffs and the Class." *Id.* ¶ 201. The Court con-

---

**36.** In *Ginley*, the court stated that "[t]ypically, a breach of fiduciary duty claim will survive the gist of the action doctrine *only* where the fiduciary relationship in question is well-established and clearly defined by Pennsylvania law or policy." *Ginley v. E.B. Mahoney Builders, Inc.*, 2005 WL 27534, at *2 (E.D.Pa. Jan.5, 2005) (emphasis added). To support this broad proposition, the *Ginley* court cited *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3d Cir.2001). In that case, the Third Circuit held that a breach of fiducia-

ry duty claim based on the duties owed by majority shareholders to minority shareholder in a joint venture was not barred by the gist of the action doctrine because Pennsylvania law imposed such a fiduciary duty in joint ventures "as a matter of social policy." *Id.* at 105. The Third Circuit did not state, however, that in order to survive a gist of the action defense, the fiduciary relationship *always* needed to be "well-established and clearly defined by Pennsylvania law."

cludes that plaintiffs' allegations throughout the Complaint demonstrate that defendants' alleged breach of fiduciary duty is based on actions beyond those specified in the breach of contract claim.

Preying on unsophisticated consumers struggling with financial difficulties, defendants have engaged in an on-going fraudulent scheme by which defendants obtain service fees and monthly payments from consumers under false pretenses. Defendants misleadingly characterized the service fees as "contributions" to a non-profit organization dedicated to advocating on behalf of consumers. In fact, the "contributions" were mandatory fees, the "non-profit" organizations shared the "contributions" with affiliated for-profit entities, and none of the companies actually advocated for the consumers. Defendants misrepresent that the monies received by defendants will be timely and promptly paid to the creditors of consumers. In actuality, defendants retain the monthly payments for their own use and benefit, earning interest on the monies of consumers, and either never pay the creditors of consumers or hold on to the monies for several months before making any payments on consumer accounts.

*Id.* ¶ 3. Because these allegations go well beyond plaintiffs' claim for breach of contract, plaintiffs' breach of fiduciary duty claim is not barred by the gist of the action doctrine, at least at the motion to dismiss stage of this litigation.

### E. *Unjust Enrichment Claim—Count Seven*

#### 1. Elements of unjust enrichment

 The elements of a claim for unjust enrichment are:

(1) Benefits conferred on defendant by plaintiff;

(2) Appreciation of such benefits by defendant; and

(3) Retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

*Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327, 328 (1995); *see also Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429, 447 (3d Cir.2000).

#### 2. Defendants' arguments

Defendants argue that plaintiffs may only allege an unjust enrichment claim against defendants FCCC and CDME, since only those defendants received payments from plaintiffs. Def. Memo. at 45. Furthermore, because FCCC and CDME handled plaintiffs' funds in accordance with their contracts, defendants argue that there was no unjust enrichment. *Id.*

#### 3. Plaintiffs have alleged the elements of unjust enrichment against all defendants

Plaintiffs have alleged that they gave defendants FCCC and CDME money through their sign-up fees. Compl. ¶¶ 36–40. Thus, they have conferred benefits on the defendants, which satisfies the first element of unjust enrichment. Plaintiffs also allege that defendants "have derived and are continuing to derive profits and revenues from their … conduct," thus alleging that defendants are appreciating the benefits conferred upon them by plaintiffs and satisfying the second element. *Id.* ¶ 212. Finally, in satisfaction of the third element of unjust enrichment, plaintiffs have alleged that it would be inequitable to allow defendants to retain this benefit, because it was derived from "false, misleading, deceptive, unfair and inequitable conduct." *Id.* Therefore, plaintiffs have alleged the elements of unjust enrichment.

Plaintiffs need not have directly dealt with each defendant in order to allege a claim of unjust enrichment against them. The claim of unjust enrichment simply requires that plaintiff "confer" benefits on a defendant; it does not require that plaintiff "directly confer" those benefits. Other courts have rejected the requirement that a plaintiff must directly confer a benefit on a defendant in order to allege unjust enrichment. *See Com. ex rel. Pappert v. Tap Pharm. Products, Inc.*, 885 A.2d 1127, 1137–38 (Pa.Commw.2005) (finding that plaintiff did not need to plead that it directly conferred a benefit on defendants for unjust enrichment claim); *D.A. Hill Co. v. CleveTrust Realty Investors*, 524 Pa. 425, 573 A.2d 1005, 1009 (1990) (stating that subcontractor could recover from owner on unjust enrichment theory, even if subcontractor did not have direct contractual relationship with owner).

### 4. Plaintiffs may plead unjust enrichment as an alternative to their breach of contract claim

Pennsylvania law prohibits recovery under the theory of unjust enrichment if the relationship between the parties is governed by written contract. *Curley v. Allstate Ins. Co.*, 289 F.Supp.2d 614, 619–20 (E.D.Pa.2003); *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa.2006) ("[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract."). In the instant case, plaintiffs acknowledge that they entered into contracts with defendants FCCC and CDME, as one of their theories of recovery against defendants is breach of contract. Compl. ¶ 205–06. Therefore, plaintiffs

may not recover against defendants FCCC and CDME on both breach of contract and unjust enrichment. However, plaintiffs may allege a claim for both causes of action, despite the legal impossibility of recovery under both, as claims in the alternative.[37] *See, e.g., Temple Univ. Hosp., Inc. v. Group Health, Inc.*, 2006 WL 146426, at *7 (E.D.Pa. Jan.12, 2006) (allowing counterclaim for unjust enrichment to proceed as an alternative claim where contract might prohibit recovery). Moreover, because plaintiffs did not enter into contracts with defendants other than FCCC and CDME, plaintiffs' claim for unjust enrichment against those other defendants may proceed for that additional reason.

### F. Plaintiffs' state law claims

Defendants argue that the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims. Def. Memo. at 42–43. That argument is based on the assumption that the Court would dismiss plaintiffs' federal claims. As analyzed above, the Court will allow plaintiffs' federal CROA and RICO claims to proceed. Plaintiffs' federal and state law claims arise out of a common nucleus of operative fact—their contacts and contracts with defendants for DMPs. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Therefore, the Court will, in its discretion, exercise supplemental jurisdiction over plaintiffs' state law claims. 28 U.S.C. § 1367; *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir.2003).

### IV. CONCLUSION

Plaintiffs' Complaint paints a picture of interrelated corporate and individual de-

---

**37.** As the Third Circuit has noted, pleading in the alternative permits "inconsistency in both factual and legal allegations." *Indep. Enter-* *prises v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir.1997).

fendants, conspiring together to defraud financially distressed consumers. Plaintiffs allege that they sought out defendants' debt-management services in an effort to reduce their debt and improve their credit, but instead were left with greater debt and worse credit. The Court will allow plaintiffs to attempt to prove their allegations. An appropriate Order follows.